IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LYLE VORNIA MOODY,

      Plaintiff,

v.                                No. 10-cv-0017 WJ/RHS

LUPE MARTINEZ MARSHALL, Warden,
JOE R. WILLIAMS, Secretary of Corrections,

      Defendants.

**MAGISTRATE JUDGE'S FINDINGS
AND RECOMMENDED DISPOSITION**

      THIS MATTER comes before the Court on Defendants' Martinez Report filed on August 1, 2012 that also moves for summary judgment (Doc. 53). Defendants contend that Plaintiff cannot prove a set of facts that would entitle him to relief (Doc. 53 at 17). Plaintiff filed his Response to the Martinez Report on August 31, 2012 and requested that the Court grant him an additional thirty (30) days to "correct mistakes and fashion some exhibits that would be helpful to the Court" (Doc. 54 at 1, ¶2). Plaintiff's Response was comprised of twenty-two (22) pages of text and seventy-six (76) pages of exhibits (Doc. 54). It appears that Plaintiff has responded with exhibits, therefore the Court will deny Plaintiff's request for an extension of time. The Court having reviewed the Defendants' Martinez Report and Motion for Summary Judgment (Doc. 53), Plaintiff's Response (Doc. 54), Defendants' Reply (Doc. 55), documents submitted for judicial review, and relevant authorities, recommends that Defendants' Motion for Summary Judgment be granted and Plaintiff's Complaint be dismissed with prejudice.

## PROCEDURAL HISTORY

Plaintiff's *pro se* civil rights action brought under 42 U.S.C. § 1983 was filed January 7, 2010 (Doc. 1).  Plaintiff's Complaint alleges that Defendants denied his right to freely exercise his religious beliefs contrary to the United States Constitution, the New Mexico Constitution and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA") while he was incarcerated at Western New Mexico Corrections Facility (Doc. 1). Plaintiff has been released from custody since the filing of this lawsuit (See Notice of Change of Address, file-stamped Dec. 15, 2010, Doc. 15)  Plaintiff contends that Defendants discriminated against Plaintiff "by engaging in a pattern and practice of denying him essential religious items and services." (Complaint at CM/ECF page 11, Attachment II pg 3 of 3", Doc. 1).  Plaintiff further claims that Defendants' "decision to violate Plaintiff's religious rights was not a mistake or inadvertent, but part of a deliberate effort to discourage, harass and humiliate the Islamic inmate membership from participating in their day to day religious activities" at Western New Mexico Corrections Facility ("WNMCF"). Id.  Plaintiff's RLUIPA claims were dismissed on December 20, 2011[1] (Doc. 44).  On April 26, 2012, the Court ordered Plaintiff to factually identify all Federal and State Constitutional claims that have not been dismissed and specify the monetary damages Plaintiff believes he is entitled to receive (Doc. 50).  Plaintiff filed a Response to the Court's order on May 24, 2012 identifying each claim and specifying the amount of monetary damages he seeks for each claim (Doc. 51).  In his Response (Doc. 51), Plaintiff demands monetary damages in the amount of $3,000,000.00 per claim with the exception of the claim that he was denied a "halal" diet for which he demands $350,000.00.

---

[1] On December 20, 2011, the District Judge entered the Order Adopting Magistrate Judge's Findings and Dismissing Plaintiff's RLUIPA Claims (Doc. 44). The Order dismissed Moody's RLUIPA claims based on the allegations that Defendants improperly denied Moody access to certain clothing, items, religious services and diet related to his Muslim faith.

Then, the Court entered its Order Directing Submission of Martinez Report on June 1, 2012 (Doc. 53). On August 1, 2012, Defendants filed their Martinez Report which seeks summary judgment on Plaintiff's remaining claims (Doc. 53 at 15).  Plaintiff filed his Response on August 31, 2012 (Doc. 54).  Respondents filed their Reply on September 14, 2012 (Doc. 55).

## LEGAL STANDARD

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  Id. at 249-50 (citations omitted).  Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

## ANALYSIS

Plaintiff alleges that he faced discrimination and was discouraged from practicing his religion while incarcerated at Western New Mexico Corrections Facility (Docs. 1, 51, and 54). He specifically alleges: (1) that he was denied possession of prayer oils, (2) that he was denied the ability to wear his "Kufi" cap at his own discretion, (3) that he was forced to pray in a multipurpose room that contained artifacts of other faiths and inadequate space in violation of tenets of his Islamic faith, (4) that prison officials failed to announce Friday Jumu'ah services

3

over the intercom system, and (5) that he was denied a "halal" religious diet (Docs. 51 and 54). Plaintiff claims that all of these actions, on the part of prison officials, violated his First, Fifth, Eighth and Fourteenth Amendment rights and State Constitutional rights and as such he is entitled to receive monetary damages.  Id.  Defendants argue that any and all of Plaintiff's claims were dismissed when the Court entered its Order Dismissing Plaintiff's RLUIPA claims (Doc. 53 at 15).  Nevertheless, Defendants filed a Martinez Report and argue that if any remaining claims exist, they [Defendants] are entitled to summary judgment.  Id. at 15.  Defendants' Martinez Report asserts that the issue presented for decision is "whether Defendants violated Plaintiff's First Amendment Rights . . ." (Doc. 54 at 18).  Defendants argue that they have not violated Plaintiff's First Amendment rights because their conduct was reasonably related to the legitimate penological interests and objectives of the New Mexico Corrections Department" (Doc. 53 at 18-19). Defendants further argue that if "Plaintiff has properly brought a civil rights claim under §1983 for discrimination, the doctrine of qualified immunity protects government defendants from liability" (Doc. 53 at 23).

The Supreme Court has considered "the standard of review for prison regulations claimed to inhibit the exercise of constitutional rights" O'Lone v. Estate of Shabazz, 482 US 342, 348 (1987).  In O'Lone v. Estate of Shabazz, the Supreme Court set forth certain "general principals" to determine whether prison regulations violate an inmate's rights under the Free Exercise Clause of the First Amendment of the United States Constitution.  Id.  "First, convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison" Id. at 348 (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)).  Second, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and

rights, a retraction justified by the considerations underlying our penal system." Id. at 348

(citing Price v. Johnston, 334 U.S. 266, 285 (1948)).

      "The Free Exercise Clause mandates that prison authorities afford prisoners reasonable

opportunities to exercise their sincerely held religious beliefs." Hammons v. Saffle, 348 F.3d

1250, 1254 (10th Cir. 2003).  However, these rights are subject to "prison restrictions rationally

related to legitimate penological interests." Id. at 1254-55.   Courts must afford appropriate

deference to prison officials when reviewing prison regulations that are alleged to infringe on

constitutional rights. Boles v. Neet, 486 F.3d 1177, 1180 (10th Cir. 2007) (citing O'Lone v.

Estate of Shabazz, 482 U.S. at 349).  Prison regulations are judged by a reasonableness test

which is less restrictive than ordinarily applied to alleged infringement of fundamental

constitutional rights. Turner v. Safely, 482 U.S. 78, 89 (1987).  In Turner, the Supreme Court

identified four factors relevant to the reasonableness inquiry:

> (1) the regulation must have "valid, rational connections" to legitimate
> governmental interests invoked to justify it, (2) whether alternative means of
> exercising the religious right is available to prison inmates, (3) the impact the
> accommodation of the right has on other inmates, prison personnel and on
> allocation of prison resources, and (4) whether alternatives exist to accommodate
> prisoners' rights at a *de minimus* cost to valid penological interests.

Turner, 482 U.S. at 89.  "Courts have pointed out, the first Turner factor is actually more of an

element than a factor in the sense that it is not simply a consideration to be weighted but rather

an essential requirement." Boles v. Neet, 486 F.3d 1177, 1181 (10th Cir. 2007).  Courts have

held that the first factor is a threshold requirement. Id.  "To satisfy the first Turner factor, prison

administration is required to make a minimal showing that a rational relationship exists between

its policy and stated goals." Beerheide v. Suthers, 286 F.3d 1179, 1186 (10th Cir. 2002).

      While Defendants do not dispute that Plaintiff's religious beliefs are sincerely held,

Defendants argue that the prison regulations are "logically connected to legitimate penological

interests and objectives of the New Mexico Corrections Department" and therefore, did not violate Plaintiff's constitutional rights (Doc. 53 at 19).

A. Denial of Prayer Oils

Defendants seek summary judgment asserting that Plaintiff could not prove a set of facts that would entitle him to relief (Doc. 53 at 18).  Defendants contend that the "decision to deny prayer oils is based on institutional security and safety applicable to all inmates" (Doc. 53 at 19). Defendants assert that possession of prayer oils could be a threat to the security of the institution, the safety of department employees and the safety of fellow inmates because they can be flammable, and used to cause damage or used to remove restraints among other potential abuses (Doc. 53 at 19).  Defendants point out that Plaintiff was charged with serious violent offenses and that "many inmates have committed violent offenses." Id.  Specifically, Defendants cite policies that prescribe the allowable faith items and prayer oils are noticeably absent from the list (Docs. 53 at 4, 53-5 at 12).

Plaintiff claims that the prison's refusal to allow him to possess prayer oils violated his rights while he was incarcerated at Western New Mexico Corrections Facility (Doc. 51 at 8, 9). First, Plaintiff argues that he was allowed to possess prayer oils in the Lea County Corrections Facility where he was housed prior to his transfer to the Western New Mexico Corrections Facility and concludes that, for this reason, he should have continued to possess his prayer oils (Doc. 51).  He claims that privately operated prisons allow prayer oils but offers no evidence to substantiate this claim (Doc. 54 at 9).  Next, he attempts to compare the possession of prayer oils to institutional items used daily such as cooking oil, butter, corn syrup and dishwashing soap but there is no evidence that these items are in the personal possession of inmates.  Id. at 10.  The Court assumes that these items are contained in the kitchen at the prison and inmate use of such

items is closely supervised and therefore does not help Plaintiff's argument that he should be allowed to possess prayer oils.  He also seeks to compare possession of prayer oils to other personal items that he contends are flammable (i.e. hair cream, hair grease, and lotions) to justify his claims but the Court is not persuaded by this comparison either.  Id.  There is no evidence offered to substantiate the flammability of the personal items Plaintiff identifies.  Finally, Plaintiff argues that prayer oils are "used traditionally as part of ceremonies performed by members of the Muslim faith," and implies that the oils are required (Doc. 51 at 7).  He argues that because prayer oils are sold on a regular basis at the Islamic Center of New Mexico to help fund Mr. Omar Ganz, a volunteer Imaan from the Islamic Center of New Mexico's prison programs, and because prayer oils are used as a form of purification before prayer sessions, they are a requirement of his faith (Doc. 54 at 13-14).

The Court considers the evidence provided by the parties and applies the Turner factors to determine whether the governmental policy is rationally related to a legitimate interest. Turner, 482 U.S. at 89.  First, the Court must determine whether there is a logical connection between the prison regulation and the asserted penological interest.  O'Lone, 482 U.S. at 350; Turner, 482 U.S. at 89-91.  Defendants introduce New Mexico Corrections Department policy CD#101301.A (Doc.53-6) which does not provide for inmate possession of prayer oils.  The affidavits of Deputy Warden Deanna Hoisington, (Doc. 53-15) and Chaplain Calvin Robinson (Doc. 53-16) are introduced and attest that prayer oils are not an allowable faith item.  In addition, Deputy Warden Hoisington's affidavit sets forth the prison's rationale for not allowing prisoners to possess prayer oils which include (1) the security risk that a prisoner could use the oils to remove the various restraints utilized by prison officials, (2) that oils are flammable and can be used to damage property or cause injury, and (3) that some prayer oils have tested positive

for certain drugs (Doc. 53-15 at 2).  In Hammons v. Saffle, the Tenth Circuit determined that

"constraining prayer oil use to supervised, communal areas decreased the likelihood that these

oils" would be used for improper or even destructive purposes.  348 F.3d at 1255.  Plaintiff does

not introduce any evidence to controvert Defendants' contention that the policy has a legitimate

penological basis.

        The Court next considers whether the inmate was provided with an alternative means of

exercising his religion. Turner, 482 U.S. at 89-91.  In O'Lone, the Supreme Court considers "the

availability of other means of exercising the right and gives "considerable deference to prison

officials." O' Lone v. Shabazz, 482 U.S. at 241.   Chaplain Robinson's affidavit states that he

contacted the "Volunteer Imaan, at the time, Mr. Omar Ganz from (Islamic Center of New

Mexico) concerning the use of oils" (Doc. 53-16 at 2) and received a response that prayer oils are

not a tenet of the faith and therefore, not required, but they are desired.  (Omar Ganz email dated

8/21/2010, Doc. 53-16 at 37).  Mr. Ganz's email specifically states that the prayer "oils are for

the simple purpose of smelling good."  Id.  Plaintiff's Response does not provide any evidence

that the prayer oils are required or essential to the practice of his religion.  Generally, Plaintiff

argues that the statements contained in Deputy Warden Hoisington and Chaplain Robinson's

affidavits are misleading and self-serving especially in relation to the accommodation discussed

below (Doc. 54).

        Even assuming that the use of prayer oils was a tenet of Islam, Plaintiff has not asserted

that use of the prayer oils was the only means of exercising his religion.  In fact, Policy CD-

101301.A contains a "Faith Groups Overview" that describes the worship practices and

allowable faith items for Islam as well as other religious denominations.  While this Overview

confirms that prayer oil is not an enumerated faith item, the worship practices description

illustrates that daily prayer times and Friday Juma'ah Service are accommodated around normal work hours (Doc. 53-5 at 12).  In addition, Plaintiff can be provided with a drop of oil for prayer services on those occasions when prayer oils are donated and provided by the Chaplain at the Friday afternoon Juma'ah services (Doc. 53-15 at 2).  Also, there is no evidence that any failure to provide prayer oils prevented Plaintiff from praying or attending Friday services.  Defendants introduced the sign in sheets that reflect Plaintiff's attendance at many Juma'ah services from 2008 through 2010 (Docs. 53-16 at 54-82; 53-17 at 1-32).  Defendants have established the reasonableness of their policy because they have demonstrated that Plaintiff was able to exercise his right to practice his religion despite being restricted from possessing prayer oils.

In consideration of the third factor, the Court evaluates how granting Plaintiff's request would impact personnel and threaten the security and safety of WNMCF.  Turner, 482 U.S. at 89.  Defendants have demonstrated that prayer oils are an obvious safety and security threat in a prison because the oils could be used to remove restraints, could be set on fire to cause property damage and bodily injury, and could contain certain drugs (Doc. 53).  Plaintiff contends that allowed practices of other faiths, like "the Native American Indians [who] burn wood every week to celebrate their religious rites and traditions" support his claims that his rights have been violated.  He generally argues throughout that the fact that other faith groups get to practice a certain way or possess certain faith items is evidence that the refusal to allow personal possession of prayer oil is a violation of his constitutional rights.  The Court is not persuaded by this argument.  The New Mexico Corrections Department policy details the many faith groups that are or could be practiced by inmates and delineates what faith items are allowed, the schedule of religious services, and specific days of observance that were determined to be allowable in light of the safety and security concerns of the institution. Based on the evidence

9

submitted, the Court is convinced that allowing Plaintiff to possess pray oils could be detrimental to the personnel and a threat to safety and security.  Therefore, under the third factor, Defendants have demonstrated that there is an impact to personnel and a potential threat to safety and security at WNMCF if personal possession of prayer oils were allowed.

The final <u>Turner</u> factor determines whether Plaintiff's demands can be accommodated at a de minimis cost to the Department's valid penological interest.  Deputy Warden Hoisington's affidavit states that when payer oils are donated and the Chaplain is available to supervise use of prayer oils, Plaintiff was provided with a small amount at Juma'ah services (Doc. 53-15 at 2).  As discussed above, prison officials cannot allow unsupervised use or possession of prayer oils given the safety and security concerns.  Plaintiff argues that Chaplain Robinson did not work on Fridays, but the testimony confirms that Plaintiff's demands were accommodated when possible.

Based on the evidence and testimony, the Court concludes that the policy banning possession of prayer oils is rationally related to legitimate penological interests.  <u>Hammons v. Saffle</u>, 348 F.3d at 1255.  The Court therefore recommends that Defendants' Motion for Summary Judgment on Plaintiff's claim that he was denied possession of prayer oils in violation of his constitutional rights be granted.

B. Restrictions on Wearing Kufi Cap

Defendants assert that all inmates are subject to restrictions pertaining to when and where an inmate is allowed to wear headgear (Doc. 53 at 19).  Defendants contend that the policy pertaining to headgear is "logically related to penological objectives of safety and security of the institution" <u>Id</u>.  Defendants introduce Policy WCNMF #110511 which delineates restrictions for use of headgear (Doc. 53-16, 26-35).   This Policy prohibits the wearing of headgear in the following locations: the dining room (Doc. 53-16 at 30), in the visitation room (Doc. 53-16 at

32), in the infirmary (Doc. 53-16 at 33), or, in the library or classrooms (Doc. 53-16 at 33).  The

Policy provides that "[i]nmates will be allowed to wear authorized hats  . . . in the housing units,

work areas and recreation yards only." (Doc. 53-16 at 34).  Deputy Warden Hoisington explains

the rationale for the headgear restriction, specifically identifying the safety risk to the facility

(Doc. 53-15 at 3).  "Wearing headgear is [] a security risk as the inmates use headgear to conceal

weapons and contraband."  Id.  Despite all of these restrictions, Plaintiff was not denied

possession of a "Kufi" cap and was allowed to wear it for prayer and in certain locations.

Plaintiff challenges prison regulations dictating the wearing of headgear, specifically, his

wearing a "Kufi" cap, claiming that the New Mexico Corrections Department violated his

constitutional rights (Doc. 51 at 13-18).  Plaintiff believes that he should have been allowed to

wear his "Kufi" cap whenever and wherever he chose because it is a symbol of his religious

beliefs (Doc. 54 at 15).  Plaintiff argues that there are "volumes of stories for the study of Islam

and the Prophet Muhammad" that will help the Court understand why he should be allowed to

wear his "Kufi" cap all of the time.  Id.  Plaintiff's Grievance File #08-198 states that "I want to

symbolize my belief in my religion by wearing my Islamic white knit cap" (Doc. 53-13 at 24).

Yet, Plaintiff offers no evidence that the wearing of the "Kufi" cap is a tenet of Islam or that he

was unable to practice his religion because he was restricted from wearing it all of the time.

Plaintiff also argues that other inmates were allowed to wear headgear "all year round" (Doc. 54

at 16) which is not supported by any evidence or affidavits.

Plaintiff was never "denied possession of a "Kufi" cap nor was he denied the right to

wear it" (Doc. 58 at 19).  Again, Plaintiff offers no evidence to contradict Defendants'

contentions that the policy has a legitimate penological basis.  Nor does Plaintiff demonstrate

that he is unable to practice his religion because he was restricted from wearing his "Kufi" cap

11

whenever and wherever he desired.  In fact, Defendants accommodated Plaintiff by allowing him to wear his "Kufi" cap indoors during prayer sessions in the housing unit and in the Chapel during prayer services (Doc. 53-15 at 3).  Defendants explain that not only does the "Kufi" cap allow for concealment of weapons and contraband but to allow Plaintiff greater privileges than other inmates, i.e. wearing of his "Kufi" cap at any time or place, could have a negative impact on the rest of the prison population. (Doc. 53 at 22).  The perception of favoritism could generate resentment and unrest.  Standing Deer v. Carlson, 831 F.2d 1525, 1529 (9th Cir. 1987).  Deputy Warden Hoisington states that prisoners are searched every time they leave or enter a building or move between areas in the prison in accordance with policies.

The Court considers the Turner factors as applied to the evidence provided by the parties. Defendants demonstrate that the policies regarding the wearing of headgear and enumerated restrictions have a rational connection to legitimate penological interest.  Turner, 482 U.S. at 89. The Court is persuaded that if Plaintiff were allowed to wear his "Kufi" cap in all areas it would require additional searches and could create delays.  This could lead to further resentment and unrest.

There is no evidence that "an alternative means of exercising the religious right" is necessary.  Defendants allowed Plaintiff to wear his "Kufi" cap when he participated in religious services and his prayer rituals.  Plaintiff fails to demonstrate that he was unable to practice his religion because he could not wear the "Kufi" cap all of the time.  Defendants' contention that if they allowed Plaintiff to wear the "Kufi" cap all of the time there would be an appreciable risk to prison safety and security and would create a negative impact on the inmates and prison personnel is compelling.

Finally, the Court concludes there is no need to consider whether there are alternatives to accommodate Plaintiff's rights at a "de minimus cost." Defendants asserted that they allowed Plaintiff to wear his "Kufi" cap a much as practicable while still conforming with the applicable headgear policies and maintaining safety in the institution.

In light of the evidence and explanation of the rationale for the headgear restrictions, the Court concludes that the policy is reasonable and recommends that Defendants be granted summary judgment on Plaintiff's claim that the restrictions imposed regarding the wearing of his "Kufi" cap violated his constitutional rights.

### C. Prayer in Multipurpose Room

Defendants seek summary judgment on Plaintiff's claim that Western New Mexico Corrections Facility does not provide a proper location for religious services (Doc. 53). Defendants contend that there is a chapel for use by all inmates to practice their respective faiths (Doc. 53-16 at 3).

Plaintiff claims that his rights were violated because Defendants did not provide a proper location for him to pray (Doc. 54 at 19). Primarily, Plaintiff argues that he was forced to pray in a "Christian Church environment" Id. He claims that the room displayed religious artifacts from non-Muslim religions and that praying in the room violated tenets of his religion thereby restricting his religious freedom. Id. Finally, Plaintiff argues that there was insufficient space to perform prayer rituals (Doc. 54. On May 16, 2008, Plaintiff filed an informal complaint NMCD #21133 claiming that he needed another place to worship because it is forbidden for Muslims to pray in chapels or churches which contain Christian artifacts (Doc. 53-13 at 16). Plaintiff filed a formal grievance on May 21, 2008 (Doc. 53-13 at 14). The grievance was investigated and it was determined that the Chapel where he was allowed to pray was a multipurpose room and not

only a Christian place of worship (Doc 53-13 at 15).  Plaintiff filed his appeal on June 13, 2008 (Doc. 53-13 at 15) which was reviewed and denied for the same reasons as the grievance (Doc. 53-13 at 13).

Defendants provide the Court with NMCD Policy CD#101300 and CD#101301 which set forth the procedures governing inmates' rights to religious services, prayer practices and other religious rituals.  Chaplain Robinson states that the Chapel serves inmates of all religions "not only Islamic inmates" (Doc. 53-16 at 3).  Western New Mexico Corrections Facility schedules Juma'ah Prayer Services on Fridays at 1:00 p.m. to allow Muslim inmates to observe their worship practice (Doc. 53-15 at 8; Doc. 56-16 at 9, 11).  Defendants contend that the rationale for the policy and procedure regarding determination of the location of the prayer services, is that "WNMCF must accommodate numerous religions" (Doc. 53 at 10).

Deputy Warden Hoisington states that when Plaintiff brought his concerns about praying in front of Christian symbols and icons to their attention, he was informed that he would be allowed to "rearrange, remove or even relocate any items or furniture in the chapel for the Juma (sic) prayer" (Doc. 53-15 at 4) but Plaintiff was instructed to return any items to their original location when he was finished (Docs. 53-15 at 4; 53-16 at 3).  Plaintiff claims: (1) that he was "told by Chaplin (sic) Calvin Robinson that any damages caused by Muslim membership" when removing and replacing the religious artifacts from other faiths would be Plaintiff's responsibility to pay for said damages (Doc. 54 at 19), and (2) that other religious groups were allowed to practice their religious ceremonies in the visiting rooms (Doc. 54 at 19).   Plaintiff offers no evidence to substantiate his allegations that he was not provided a proper location to pray, or that he would be personally held responsible to pay for any damages to any religious articles that were moved.

As to Plaintiff's other complaint, the chapel accommodates up to fifty participants (Doc. 53-16 at 3). Chaplain Robinson stated that there were on average three to five inmates attending the Juma'ah services (Doc. 53-16 at 3). Defendants submitted for Court review copies of sign-in sheets during 2008, 2009 and 2010 which reflect that there were usually three to five participants in the Friday services (Doc. 53-16 at 54-82; Doc. 53-17 at 1-32). Most of these sign-in sheets confirm that Plaintiff regularly attended the Friday services. Id.

The Court considers the <u>Turner</u> factors in light of the evidence presented by the parties. What is abundantly clear to the Court is that scheduling the time and location of prayer services for all inmates should be left to prison officials. The scheduling of inmate services has a logical connection to legitimate government interests because prison officials must maintain order and safety within the institution while allowing inmates to practice their religion. There is no evidence that would suggest that Defendants should accommodate Plaintiff with an "alternative means of exercising religious rights" regarding the location of the prayer services. Defendants provide testimony that (1) the Chapel is a multipurpose building for the use of all religions, (2) that Plaintiff was allowed to remove or cover any allegedly offensive images as long as he returned them to their respective locations after the conclusion of the services, and (3) that there was sufficient space for conducting the services (Docs. 53-15 at 4, 53-16 at 3). In the event of a "lock down," Muslim inmates could pray in their cells (Doc. 53-15 at 5). Deputy Warden Hoisington testified that Muslim inmates were additionally accommodated because there were allowed to use the Chapel unsupervised for their Friday Juma'ah prayer without any volunteer or any other supervision (Doc. 53-15 at 4). Muslim inmates were let into the Chapel to prayer. Id.

Plaintiff suggests that the Friday prayer services could be held in other locations. However, Defendants expressly state that "granting greater privileges to Islamic practitioners in

the NMCD could result in the perception of favoritism, which could have a negative impact on

the rest of the prison population and on the NMCD efforts to encourage positive programming"

(Doc. 53 at 22) (citing Standing Deer v. Carlson, 831 F.2d at 1529).  The Court is persuaded by

Defendants' arguments that granting Plaintiff's request to conduct services in a different location

could negatively impact personnel, and inmates and threaten the safety and security at Western

New Mexico Correctional Facility.  Further, the Court concludes that there is not an alternative

that could be provided for at a de minimus cost to valid penological interests.

Therefore, in consideration of the Turner factors, the Court concludes that the policy is

reasonable and rationally related to legitimate penological interests and recommends that

Defendants be granted summary judgment on Plaintiff's claim that his constitutional rights were

violated because he had to use the "Chapel" for Friday Juma'ah services.

D. Failure to Announce Juma'ah Services on Fridays

Defendants also seek summary judgment on Plaintiff's claim that he had a Constitutional

right to have Juma'ah services announced on Fridays (Doc. 53).  Defendants assert that there was

a monthly calendar distributed that advised staff and inmates of all religious services as well as

contemporaneous announcements over the intercom (Doc. 53 at 21).  "[C]alendars were posted

in the inmate housing unit and Chapel" so inmates and staff would be advised of the schedule.

(Doc. 53-15 at 4).  Plaintiff claims that his Constitutional rights were violated when Friday

Juma'ah services were not announced because he was not allowed to attend unless there was an

announcement (Doc. 51 at 21-22).  He filed Grievance #08-144 (Doc. 53-13 at 10-12) asserting

that services were not being announced and he was unable to practice his religion.

The Court reviews New Mexico Corrections Department Policy CD 10130 and Policy

CD 101301 which delineate the policies and procedures governing Western New Mexico

16

Corrections Facility's religious programs (Doc. 53-4 at 1-8). These Policies provide that inmates

have "the opportunity to participate in practices of their religious faith that are deemed essential"

(Doc. 53-4 at 8). In compliance with these Policies, Juma'ah Services were scheduled for 1:00

p.m. each Friday, and Muslim inmates were allowed to attend unless the Western New Mexico

Corrections Facility was in "lock-down" (Doc. 53-15 at 4-6; Doc. 53-16 at 10-23). Defendants

demonstrate that Plaintiff's Grievance #08-144 was resolved because the "day shift captain

advised the grievance officer that he makes sure that Juma'ah Services are announced" (Doc. 53-

13 at 10). Deputy Warden Hoisington stated in her affidavit that when Plaintiff complained that

services were not being announced on the intercom, she distributed "memos" reminding staff

that "religion is a priority and should only be cancelled for emergencies" (Doc. 53-15 at 4-6, 8-

9). Deputy Warden Hoisington further stated that after Plaintiff complained she would listen

for the announcements on her radio and would call master control to make sure services were

being conducted. Id. Defendants provide copies of "sign in sheets" for Friday Juma'ah Services

that were conducted in 2008, 2009 and early 2010 (Doc. 53-16 at 54-82; Doc. 53-17 at 1-32).

The sign in sheets demonstrate that Plaintiff attended many if not a majority of the Juma'ah

Services. Id. Deputy Warden Hoisington asserts that regardless of whether the services were

announced, they were able to attend the services because the calendar was posted in the units

(Doc. 53-15 at 4). Plaintiff was advised that he just had to notify an officer or other employee

that it was time for Juma'ah Services and he would have been "let into the Chapel" (Doc. 53-15

at 5). Plaintiff offers no evidence to contradict Defendants' assertion that whether services were

announced, Muslim inmates were allowed to attend services.

      The Court again applies the Turner factors to determine whether the governmental policy

is rationally related to a legitimate interest. Turner, 482 U.S. at 89. The Court is persuaded by

the evidence introduced by the parties that there is a logical connection between these regulations

and a legitimate penological interest: maintaining order and safety at the institution. O'Lone, 482

U.S. at 350.  This is similar to the prior discussion concerning location of services.  Policies and

procedures governing religious programs also dictate that officials will determine when services

are conducted (Doc. 53-5 at 1-8).  A calendar of services is prepared by the responsible staff

member, in this case Chaplain Robinson, and then the calendar is provided to personnel and

inmates (Doc. 53-16 at 10-23).  While Plaintiff claims that services were not announced and as a

result he was unable to attend, Defendants offer competent testimony and evidence that

contradict these claims (Deputy Warden Hoisington's affidavit and the sign-in sheets) (Doc.53-

15 at 1; Doc. 53-16 at 54-82; Doc. 53-17 at 1-32).   Deputy Warden Hoisington attests that in the

event of a "lock-down," Muslim inmates were allowed to perform their prayers in their

individual cells Id.  Thus, providing Muslim inmates with "an alternative means of exercising

their religion." Turner, 482 U.S. at 89-91.  The policies and Deputy Warden Hoisington's

testimony confirm that allowing inmates to practice their respective religions is considered a

priority by the New Mexico Correctional Department (Doc. 53-15 at 5; Doc. 53-5 at 1-8).

    The Court does not believe that the third and fourth factors need to be considered.

Whether Plaintiff's request would impact personnel and threaten the security and safety of

Western New Mexico Correctional Facility or whether Plaintiff's demands can be

accommodated at a de minimus cost  is not relevant.  Defendants offer testimony and evidence

confirming that they complied with Plaintiff's request that Friday Juma'ah Services be

announced (Doc. 53-15 at 4-5; Doc. 53-16 at 3).  Not only were the Friday Juma'ah Services

announced, a calendar with scheduled services was posted (Doc.  ).  The Court does not see the

need for any accommodation or for any additional cost be expended where the policy of the institution is already being complied with.

In light of the <u>Turner</u> factors, the Court concludes that the Policy does not violate Plaintiff's Constitutional rights and that his claim that his rights were violated should be denied. Therefore, the Court recommends Defendants' Motion for Summary Judgment be granted.

E. Religious Diet

Finally, Defendants seek summary judgment on Plaintiff's claim that he was denied a religious diet (Doc. 53).  Defendants contend that Plaintiff refused to follow the proper procedures for receiving a religious diet (Doc. 53).  A prisoner has an established right under the Free Exercise Clause of the First Amendment to receive a diet consistent with his religious beliefs. <u>See</u> <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1070 (10th Cir. 2009) ("inmate's right to free exercise of religion includes the right to a diet that conforms with their religious beliefs"); <u>LaFevers v. Saffle</u>, 936 F.2d 1117, 1119 (10th Cir. 1991)("individual's genuine and sincere belief in religious dietary practices warrants constitutional protection"); <u>Lovelace v. Lee</u>, 472 F.3d 174, 198 (4th Cir. 2006); <u>Ross v. Blackledge</u>, 477 F.2d 616, 618–19 (4th Cir. 1973).  Courts defer to the expertise of prison administrators in managing the challenges arising from incarceration. <u>O'Lone</u>, 482 U.S. 349; <u>Turner</u>, 482 U.S. 89-91.  However, they may find a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a First Amendment challenge if it is rationally related to a legitimate government interest. <u>Id</u>.

Plaintiff never signed the "Religious Diet Agreement" ("Agreement") (Doc. 53-15 at 6; Doc. 54 at 21).  Also, he never claims that signing the Agreement or complying with the terms of the Agreement would violate his religious beliefs.  He contends that he refused to sign the agreement because (1) he could be prosecuted for violating the Agreement without the

Agreement setting forth penalties and (2) that the agreement failed to disclose the "foods, caloric intake, nutritional value, or percent daily value servings per container" (Doc. 54 at 21). Plaintiff filed Grievance #08-204, dated August 17, 2008, complaining about his diet (Doc. 53-13 at 58). He specifically stated that "[t]he state has an obligation to provide a proper, healthy and palatable diet for diabetics" he goes on to state "he is diabetic." Id. Plaintiff filed another Grievance #08-217, dated September 5, 2008, again complaining about the nutritional content and palatability of the diabetic tray (Doc. 53-13 at 62). Then on September 5, 2008, he filed Grievance #08-219 wherein Plaintiff demanded a copy of the diabetic food menu (Doc. 53-13). Plaintiff filed Grievance #10-070 on June 6, 2010 and Grievance #10-078 on July 5, 2010 complaining about the diabetic meal, comparing its contents to the regular meal and asserting harassment (Doc. 53-14 at 17, 25). Plaintiff provided copies of documents, dated January 6, 2009 and February 21, 2009, appearing to be unfiled or informal grievances that complain about food service, specifically complaints also about the diabetic diet (Doc. 54-4 at 4, 5). None of these complaints address any request for a "Halal" meal or complain about any denial of the religious meal.

Plaintiff never formally requested yet was approved to receive a religious diet (Doc. 58 at 20; 53-15 at 6). All Plaintiff needed to do was sign the Agreement to begin receiving the religious diet he desired (Doc. 53-15, at 6). Plaintiff wanted to participate without signing the agreement (Doc. 53-15 at 6; Doc. 54 at 21). As stated above, Plaintiff claims he was denied a religious diet but his grievances never seek redress for being denied a religious diet. Ultimately, Plaintiff filed this lawsuit making claims that he was denied a "halal" diet (Doc. 1).

In support of summary judgment, Defendants assert that the "Agreement is required of all inmates requesting a religious diet" in accordance with the guidelines set forth in Policy Nos. CD 101300 and CD 101301 (Doc. 53). These Policies "provide for religious diets for inmates whose

religious beliefs require the adherence to religious dietary laws" (Doc. 53-6 at 7). Defendants' introduced Deputy Warden Hoisington's testimony that the "halal" meal was a more expensive meal (Doc 53-15 at 6). In fact, Deputy Warden Hoisington attests that the "halal" meal has been discontinued because the regular meal is pork free and meets the criteria for the Muslim dietary requirements and did while Plaintiff was incarcerated (Doc. 53-15 at 6).

The Court concludes that no constitutional violation occurred where Plaintiff was not given a "Halal" meal because he received a prescribed "diabetic" meal as detailed in the Corrections Department's responses to each of his formal grievances complaining about his meals (Doc. 53-13 at 57, 59, 61, 63, 64, 66; Doc. 53-14 at 16, 18, 24, 26). Plaintiff's complaint that he was denied a "halal" meal appears questionable to this Court except for Deputy Warden Hoisington's and Chaplain Robinson's testimony that he refused to sign the Agreement. His documented grievances do not demonstrate that Plaintiff was ever concerned that he did not receive a "halal" meal or concerned with the religious significance of not consuming a "halal" meal, at least not until he filed the instant litigation. All of his grievances complained about the diabetic meal he received in contrast to the regular meal other inmates received. Id. Complaints about receiving a "turkey roll" in contrast to "roasted chicken" does implicate a constitutional violation (Doc. 53-14 at 17, 25).

The Court concludes that the policies and procedures pertaining to religious diets has a rational relationship to legitimate penological interests and that Western New Mexico Corrections Facility followed these policies and procedures. The Court, therefore, recommends that summary judgment should be granted in favor of Defendants on this claim.

## QUALIFIED IMMUNITY

Defendants assert they are entitled to qualified immunity from Plaintiff's claims (Doc. 53).  Plaintiff does not respond to Defendants' claim of qualified immunity.  The Court finds that Defendants are entitled to summary judgment, and therefore declines to address Defendants' arguments for qualified immunity.

## RECOMMENDED DISPOSITION

The Court concludes that Plaintiff is not entitled to any relief with respect to the claims raised in his Complaint (Doc. 1 ).  The Court further concludes that Defendants are entitled to summary judgment. Therefore, the Court recommends that Plaintiff's Complaint (Doc. 1) and this civil proceeding be DISMISSED WITH PREJUDICE.

Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant 28 U.S.C. § 636(b)(1), file written objections to these proposed findings and recommended disposition.  A party must file any objections with the clerk of the district court within the fourteen (14) day period allowed if that party would like to have appellate review of the proposed findings and recommendations.  If objections are not filed, appellate review will not be allowed.

Robert Hayes Scott

ROBERT HAYES SCOTT
UNITED STATES MAGISTRATE JUDGE